# EXHIBIT 1

| | DATE FILED: January 11, 2021 6:30 PM <br> FILING ID: C1C55CA677CFE <br> CASE NUMBER: 2021CV30096 |
|---|---|
| DISTRICT COURT, CITY AND COUNTY OF DENVER, COLORADO <br><br> Denver City & County Building <br> 1437 Bannock Street, Room 256 <br> Denver, CO 80202 <br> Court telephone: (720) 865-7800 | ▲ COURT USE ONLY ▲ |
| Plaintiff: DEBRA MOORE <br><br> v. <br><br> Defendant: COMPASS GROUP USA, INC. d/b/a EUREST DINING SERVICES | Case Number: |
| Attorneys for Plaintiff: <br><br> Mari Newman, # 30192 <br> Helen Oh, # 54056 <br> 1543 Champa Street, Suite 400 <br> Denver, CO 80202 <br> Phone: 303-571-1000 <br> Fax No.: 303-571-1001 <br> mnewman@kln-law.com <br> hoh@kln-law.com | Division: |
| **COMPLAINT AND JURY DEMAND** | |

Plaintiff, Debra Moore, by and through her attorneys, Mari Newman and Helen Oh of KILLMER, LANE & NEWMAN, LLP, hereby files her Complaint and Jury Demand against Defendant Compass Group USA, Inc. d/b/a Eurest Dining Services ("Eurest"), and respectfully alleges as follows:

## I. INTRODUCTION

1. Plaintiff Debra Moore was a dedicated, well-respected, and effective employee of Defendant Eurest for nearly twenty-six years, until Eurest unceremoniously fired her at age

sixty-three.

2. The termination came as a total shock, as Ms. Moore had a pristine record of promotions and awards throughout her tenure at Eurest, and just a month or two earlier, Ms. Moore's supervisors had promised her that she would be transferred to a new account as her most recent one was closing.

3. Ms. Moore's planned transfer to a new account was par for the course. As she rose through the ranks, and eventually in her role as a Food Service Director, Ms. Moore had been assigned to various customer accounts where she had successfully performed a wide range of managerial and other responsibilities.

4. Ms. Moore's experience of moving between different Eurest accounts was not at all unique. When an account closed, the company's normal business practice was to transfer employees to a different account, to or permit them to "float" and assist accounts as needed until another position opened. Ms. Moore witnessed and experienced this common practice throughout her decades with the company.

5. Because the practice was so common, Ms. Moore had no reason for concern when Eurest informed her that her most recent account assignment would be closing and assured her that she would still have a job after it closed.

6. To Ms. Moore's utter surprise, when her account closed in February 2019, she was neither transferred to another account nor permitted to float. Instead, Eurest abruptly fired Ms. Moore with a mere two days-notice.

7. Defendant Eurest broke its promise to Ms. Moore, and unlawfully and willfully terminated Ms. Moore because of her age and and/or sex.

8. Defendant also misclassified Ms. Moore's title and drastically underpaid Ms. Moore compared to her younger, male counterparts.

9. As a result of Defendant's illegal conduct, Ms. Moore has suffered loss of wages and benefits, severe emotional distress, loss of enjoyment of life, and other significant injuries, damages, and losses.

## II. PARTIES, JURISDICTION AND VENUE

10. The events alleged herein to be unlawful were committed in the State of Colorado.

11. This Court has jurisdiction over this matter pursuant to C.R.S. § 13-1-124(1).

12. Venue is proper in this Court pursuant to Colo. R. Civ. P. 98(c).

13. Defendant Compass Group USA, Inc. d/b/a Eurest Dining Services ("Eurest") is a business headquartered in Charlotte, North Carolina, and has been operating in Denver County under the laws of the State of Colorado during all relevant time periods.

14. Plaintiff Debra Moore has been a resident of, and domiciled in, the State of Colorado during all times relevant to the allegations in this Complaint.

## III. ADMINISTRATIVE PREREQUISITES

15. Plaintiff timely filed a Charge of Discrimination with the Colorado Civil Rights Division ("CCRD"). Plaintiff awaits a determination and Notice of Right to Sue, at which time all administrative prerequisites have been met.[1]

---

[1] Ms. Moore timely filed her Charge with the CCRD on February 19, 2019 and an Amended Charge on August 14, 2019. The Charge was transferred to the Equal Employment Opportunity Commission ("EEOC") pursuant to the agencies' work sharing agreement. Plaintiff is still awaiting a determination and Notice of Right to Sue. Upon receipt of a determination, all administrative prerequisites will have been met. Ms. Moore anticipates filing an Amended

3

## IV. FACTUAL ALLEGATIONS

### *Ms. Moore served Eurest as a successful and dedicated employee for twenty-six years.*

16. Defendant Eurest provides food, beverage, and catering services to various businesses across the country and employs over 280,000 people nationwide.

17. Ms. Moore began her employment with Eurest in 1993 as a part-time employee for Eurest's Service America account, working as a server in a Eurest-operated restaurant in Denver, Colorado.

18. In recognition of her hard work, a year later, Eurest transferred Ms. Moore to its AT&T account to assist in the catering department, where her duties included the responsibility of cash drawer counting.

19. After another year, Ms. Moore began helping in the office, completing administrative tasks and filling in for absent managers.

20. In November 2002, Ms. Moore earned a significant promotion to Food Service Director III, wherein her pay status changed from hourly to salaried.

21. In this new management role, Ms. Moore's duties included employee hiring, menu creation, employee supervision, handling paperwork and billing, ordering supplies, catering, cooking, and managing client and customer issues.

22. In recognition of her outstanding performance, Eurest granted Ms. Moore two corporate awards in 2002: Associate of the Year and the Above and Beyond the Call Award.

23. Throughout the years, Eurest consistently praised Ms. Moore for her managerial skills, quality of work, and success training others. Her annual performance reviews showed that

---

Complaint with additional claims under the Colorado Anti-discrimination Act ("CADA") upon her receipt of her Notice of Right to Sue.

she was a dependable and hardworking employee, as she was consistently ranked in the "Commendable" or "Exceeds Expectations" categories, with "Exceptional" ratings for job knowledge and attendance.

24. In her twenty-six years working for Defendant, Ms. Moore never received a write-up, nor any other disciplinary action.

### *Unbeknownst to Ms. Moore, Defendant Eurest frequently and secretively changed Ms. Moore's title and salary in a discriminatory manner.*

25. Between 2009 to 2013, Eurest transferred Ms. Moore to various accounts where she had very similar management responsibilities.

26. Unbeknownst to Ms. Moore, Eurest changed her title and salary with her various account transfers throughout that time. Despite performing largely the same managerial role and responsibilities throughout these account transfers, Ms. Moore's title changed from Food Service Director II to Senior Catering Captain, Client Services Manager, Service Manager II, Food Service Director III, and Chef Manager. These titles had varying pay grades, and Eurest significantly cut Ms. Moore's pay during this time without informing her and without her knowledge.

27. In 2005, Eurest promoted Ms. Moore to Food Service Director II with an annual salary of $39,850.

28. In 2007, she continued as Food Service Director II and her annual salary increased to $43,158.

29. However, according to Eurest, on or around March 27, 2009, Ms. Moore's title was changed to Senior Catering Captain and her salary was dramatically decreased to $31,200. A mere week later, her title changed again to Client Services Manager, where her annual salary

5

increased to $35,000. Three months after that, her title was again changed to Service Manager II wherein her salary was left unchanged.

30. According to Eurest, on or around September 2009, Ms. Moore was moved to the Keysight Technologies ("Keysight") account as Service Manager II. She managed the Keysight account for nearly ten years until Eurest unceremoniously terminated her on February 13, 2019.

31. In 2010, Eurest changed Ms. Moore's title to Food Service Director III and her annual salary was $38,900.

32. In 2011, Eurest changed Ms. Moore's title to Service Manager II, and reduced her pay to $35,613 per year.

33. According to Eurest, in 2013, Ms. Moore's title changed to Chef Manager and her annual salary was $42,920.

34. It was not until 2014 that Ms. Moore's salary as a Chef Manager finally surpassed what it had been *seven years prior* when she was a Food Service Director II, the title she believed she had continuously since 2005.

35. To Ms. Moore's dismay, it was not until she received information through the CCRD that she learned Eurest had misclassified or changed her position to reduce her pay grade on numerous occasions while she nonetheless performed the same essential managerial responsibilities.

36. According to Eurest, Ms. Moore's title remained Chef Manager on the Keysight account from 2013 until it terminated her in 2019.

37. According to Eurest, about half of Ms. Moore's title and salary changes that occurred between 2009 to 2013 occurred while she was the manager of the Keysight account.

38. At no point during Ms. Moore's management of the Keysight account did her responsibilities or work circumstances change. This was generally true even before she was transferred to the Keysight account. Yet, Eurest still changed her title and salary for the insidious purpose of paying her less than her younger, male counterparts.

39. Throughout her ten years managing Keysight, Ms. Moore was responsible for creating menus, hiring and firing, preparing food, managing the cash register, fulfilling inventory, submitting reports to corporate, catering, cooking, and more.

40. Ms. Moore was well-respected and appreciated. Her staff characterized her as a great manager who was highly knowledgeable, kind, extremely hardworking, and dedicated to the company. Some observed that when Ms. Moore was first transferred to the Keysight account and took over cafeteria management, the food quality improved exponentially.

### *Defendant Eurest repeatedly assured Ms. Moore of her continued employment, and Ms. Moore reasonably relied on Eurest's promises.*

41. Ms. Moore and her younger, male subordinate, Santiago Rodriguez knew for several years that the Keysight account was going to close in early 2019.

42. When an account closed, Eurest's normal business practice for all employees was to automatically reassign them to another account or allow them to "float" on various accounts as needed until a position became available. This common and well-established business practice occurred through informal verbal offers, and employees were not required to apply for a new position or account transfer.

43. Ms. Moore herself had been transferred to various accounts at least seven times throughout her twenty-six-year tenure at Eurest. Each of her transfers occurred through an informal, verbal offer, and she was never required to apply for a new position or transfer. Ms.

Moore repeatedly observed this practice when Eurest transferred or floated her younger and/or male colleagues.

44. Toward the end of the 2018 calendar year and in light of the Keysight account's impending closure, Ms. Moore received assurances from her Eurest supervisors that she would still have a job after the Keysight account closed.

45. On December 8, 2018, Ms. Moore attended a training class in San Diego and talked with the President of Eurest's Western States Division, Ed Mugnani. Aware that Ms. Moore had decades of experience with the company and that her account was due to close in several months, Mr. Mugnani assured Ms. Moore with certainty that she would still have a job with the company after the account closed.

46. Shortly thereafter, around the end of December 2018 or early January 2019, Eurest's Century Link/Mineral account manager, Anthony Frisch, told Ms. Moore about his need for a front-of-house and coffee station manager on his account. Having the authority to initiate transfers for his account, Mr. Frisch asked Ms. Moore if she was interested in the position, and Ms. Moore said yes. Mr. Frisch then confirmed to Ms. Moore that the job was hers and assured her he would talk with Ms. Moore's boss and Eurest District Manager, Tim Loadman, about the timing and logistics of her start on Eurest's Century Link/Mineral account.

47. Eurest had a financial interest in retaining Ms. Moore in her current role to enjoy the benefits of her excellent and reliable work. Eurest also had a financial interest in retaining Ms. Moore because she performed the same work as her younger and/or male counterparts for a lower rate of compensation (though she did not know this).

48. Acting through its managers, Mugnani and Frisch, Eurest gave Ms. Moore false

8

information with the intent or knowledge that she would continue her excellent work for Eurest for as long as possible without complaint, and forgo applying for other job opportunities in reliance on their statements. Eurest, through its managers, failed to exercise reasonable care or competence when it communicated these representations to Ms. Moore.

49. Considering Eurest's well-established practice of transferring or floating employees when their accounts closed (which Ms. Moore herself experienced and observed throughout her tenure when she was younger), the fact that Mr. Mugnani was her boss's superior who supervised her region and knew her length of tenure, and Mr. Frisch's role as manager of Eurest's Century Link/Mineral account, Ms. Moore justifiably and foreseeably relied on their false statements and reasonably believed that Eurest would honor its promise to move her to its Century Link/Mineral account, as this was the typical way Eurest would transfer its employees.

50. Ms. Moore was reasonable in her belief; her younger male subordinate, who was also present the day Ms. Moore spoke with Mr. Frisch, likewise believed that Ms. Moore had been offered, and accepted, the position at Eurest's Century Link/Mineral account.

51. In reliance on Mr. Mugnani's and Mr. Frisch's statements, Ms. Moore forewent searching for other jobs, which was especially detrimental to her as a sixty-three-year-old woman who had been employed by Eurest for nearly twenty-six years, and had not needed to search for employment since 1993.

52. Toward the end of January 2019, Eurest District Manager Jason Hayes stopped by to talk to Ms. Moore about the closing of the Keysight account because Mr. Loadman was out on leave. Mr. Hayes mentioned that there may not be another position for Ms. Moore, to which she responded that she had been told that she was going to Eurest's Century Link/Mineral account.

9

Mr. Hayes said the opening of Eurest Century Link/Mineral account was pushed out until April 2019 and otherwise did not comment.

53. Unbeknownst to Ms. Moore, Eurest concealed or failed to disclose the fact that it knew that Ms. Moore was being terminated, with the intent of creating a false impression that she would continue to work for the company after her account closure. Eurest concealed or failed to disclose this fact with the intent that Ms. Moore continue her excellent (and underpaid) work until Eurest's Keysight account closed, and that she would do so without issue.

54. Still, Ms. Moore had no reason to believe that her job was in peril, as she reasonably believed she would then be given the opportunity to float between positions until the April 2019 opening, as she had so often observed her younger and male colleagues do.

### *Eurest unexpectedly terminated Ms. Moore's employment.*

55. Much to Ms. Moore's surprise, at the beginning of February 2019, Eurest Resident District Manager, Aric Griffin, called Ms. Moore and told her that he was working on her severance package. Ms. Moore was shocked and upset by this wholly unexpected news, but was hopeful that Mr. Loadman would return from leave and that he would still find a new position for her as the company had always done when she was younger, and consistent with Eurest's repeated promises to her.

56. On February 11, 2019, Mr. Griffin called Ms. Moore and asked when she could come and pick up the signed severance agreement that he had emailed earlier that day. He also told Ms. Moore that her last day would be February 13, 2019, a mere two days after she received the paltry severance package. Ms. Moore never signed the document.

57. Ms. Moore attempted to utilize the company's grievance process to no avail. On

her last day of employment on February 13, she complained to Mr. Hayes about her unfair firing. Mr. Hayes told her that she could expect a call from Ron Serluco, the Senior Vice President of Eurest. Ms. Moore never heard back from Mr. Serluco nor Mr. Hayes.

### *Eurest retained less qualified younger and male employees.*

58.     At or around the same time that it fired Ms. Moore, Eurest retained similarly (or less) qualified male and younger employees whose accounts had also closed.

59.     For example, around the time Eurest terminated Ms. Moore, another manager or chef manager, Brian Cwik, also experienced an account closure. Mr. Cwik had a similar role and responsibilities as Ms. Moore, but was both male and considerably younger. However, unlike Ms. Moore, Defendant Eurest floated and then transferred Mr. Cwik when a new position became available, despite Ms. Moore having significantly more experience than he did.

60.     Additionally, after Eurest terminated Ms. Moore, it permitted another manager or chef manager, Joe Town, to float until a position became open on another account. Mr. Towns was an estimated thirty to forty years old, with a similar role and responsibilities to Ms. Moore, but less experience than she. Nonetheless, Eurest allowed him to keep his job when his account closed, unlike Ms. Moore.

61.     Moreover, after the Keysight account closed, Eurest offered to float Ms. Moore's younger, male subordinate, Mr. Rodriguez to another account, despite Ms. Moore having at least ten more years of experience at Eurest than he did. However, when Mr. Rodriguez learned that Ms. Moore had been fired after her years of dedication and stellar work, he left his employment with Eurest due to what he observed was Eurest's unfair and discriminatory treatment of Ms. Moore.

11

### *Eurest paid Ms. Moore less than her similarly situated younger, male counterpart for doing substantially equal work.*

62. When Eurest terminated Ms. Moore, her salary was $52,243.

63. The other male employee who worked in conditions where the work performed was basically the same as Ms. Moore's, performed work substantially equal to that of Ms. Moore, and also reported to Mr. Loadman, was Chef Manager John Ehrhart. Mr. Ehrhart was forty-two years old at the time of Ms. Moore's termination and was hired by Eurest in 2015 with a Bachelor of Science degree in Restaurant and Catering Management, but with significantly less relevant work experience. Mr. Ehrhart's salary at the time of Ms. Moore's termination was $60,000.

64. Despite Ms. Moore performing work that required equal skill, effort, and responsibility to that of Mr. Ehrhart, the twenty-two additional years of experience at Eurest she carried, and the additional years of restaurant and catering service management experience (also specific to Eurest) that she possessed, Eurest paid Mr. Ehrhart almost $8,000 more than Ms. Moore each year.

### *Despite her best efforts, Ms. Moore was unable to find reemployment.*

65. After Eurest terminated Ms. Moore, she applied for numerous jobs every week, but did not receive any offers of employment.

66. Without any other source of income, Ms. Moore was extremely distressed and worried about not being able to support herself until retirement. She eventually applied for and received unemployment compensation, which was provided for just six months.

67. Still unable to find work, she currently supports herself through her deceased husband's social security income.

68. As a result of Defendants' intentional, willful, unlawful and discriminatory conduct, Ms. Moore has suffered and will continue to suffer substantial injuries, damages and losses.

## V. STATEMENT OF CLAIMS FOR RELIEF[2]

### FIRST CLAIM FOR RELIEF
### Promissory Estoppel

69. Plaintiff hereby incorporates all allegations contained in this Complaint as though fully set forth herein.

70. Throughout her 26-year tenure with Eurest, Plaintiff observed that Eurest's regular business practice was to transfer its employees, or to allow them to "float", when the account where they had previously been assigned closed.

71. Consistent with its regular practice, Defendant promised Plaintiff that she would still have a job after her last account closed.

72. Defendant told Ms. Moore that she would be transferred to Eurest's Century Link/Mineral account as a front-of-house and coffee station manager.

73. Given her tenure with the company, breadth of experience, and history of good performance in a variety of roles and multiple different accounts, Ms. Moore was qualified to serve in that, or any number of other positions within the Eurest.

74. Because of these factors, as well as Ms. Moore's (and others') observations regarding Eurest's standard practice of transferring employees or allowing them to "float" when no specific account had an open position, it was reasonable for Ms. Moore to rely on Eurest's

---

[2] As noted in fn. 1, upon receiving a determination and a Notice of Right to Sue, Plaintiff anticipates amending her complaint to add claims under CADA.

13

representations that she would continue to have a job at Eurest (whether in the Century Link/Mineral account or elsewhere) when her most recent account closed.

75. Defendant reasonably expected to induce Plaintiff to forgo searching for other job opportunities until the Keysight account closed.

76. Plaintiff reasonably and foreseeably relied on Defendant's promises of the terms and conditions of her employment to her detriment as she forewent searching for other jobs, which was especially harmful to her as a woman near retirement age who had been out of the job search market for decades, who would statistically have much greater difficulty in obtaining new employment than someone much younger than she. Indeed, Plaintiff was unable to obtain comparable (or any) employment despite her many efforts. Without any other source of income, Plaintiff was extremely distressed and worried about not being able to support herself.

77. Unable to find work, Plaintiff applied for and received six months of unemployment compensation. She currently supports herself through her deceased husband's social security income, which is just enough to support herself for the time being.

78. These circumstances demonstrate that injustice can be avoided only by enforcement of Defendant's promise.

79. Because of Defendant's conduct, Plaintiff foreseeably suffered significant injuries, damages, and losses.

### SECOND CLAIM FOR RELIEF
### Negligent Misrepresentation or Omission

80. Plaintiff hereby incorporates all allegations contained in this Complaint as though fully set forth herein.

81. Defendant, in the course of its employment, gave false information to Plaintiff by telling her that she would have a job after the Keysight account closed.

82. Defendant, in the course of its employment, gave false information to Plaintiff by assuring her that she would be transferred to the Century Link/Mineral account as a front-of-house and coffee station manager.

83. Defendant made a misrepresentation of a material fact in the course of Defendant's business or employment in a transaction in which Defendant had a financial interest in retaining Plaintiff in her current role and salary for as long as possible without complaint.

84. Defendant was negligent in communicating the information to Plaintiff (or in failing to disclose material information to Plaintiff).

85. Defendant gave Plaintiff false information, and/or failed to disclose relevant information, with the intent or knowledge that Plaintiff would continue working for Defendant and forgo applying for other job opportunities in reliance on it.

86. Plaintiff justifiably, reasonably, and foreseeably relied on the false information supplied by Defendant which foreseeably caused her to suffer significant injuries, damages, and losses.

### THIRD CLAIM FOR RELIEF
### Fraudulent Concealment or Non-Disclosure

87. Plaintiff hereby incorporates all allegations contained in this Complaint as though fully set forth herein.

88. Defendant made false representations of a past or present fact or concealed or failed to disclose a past or present fact which it had a duty to disclose by telling Plaintiff that she would have a job with Defendant after the Keysight account closed, assuring her that she would

15

be transferred to the Century Link/Mineral account as a front-of-house and coffee station manager, and/or failing to tell her that she was not going to have a job when she expressed her certainty in being transferred to the Century Link/Mineral account or elsewhere within the company.

89. Defendant's statements of fact were material.

90. Defendant made these statements knowing them to be false or Defendant was aware that it did not know whether they were true or false, and/or Defendant failed to disclose the fact that Plaintiff would not have a job with Defendant with the intent of creating the false impression that Plaintiff would still be employed after the Keysight account closed.

91. Defendant made the representations with the intent that Plaintiff rely on them so she would continue her excellent work on the Keysight account for as long as possible and without complaint, and/or Defendant concealed or failed to disclose the fact that it knew Plaintiff would no longer have a job after the Keysight account closure with the intent that Plaintiff continue to diligently work on the account for as long as possible without complaint.

92. Plaintiff justifiably, reasonably, and foreseeably relied on Defendant's representations of the terms and conditions of her employment in forgoing the opportunity to apply for other jobs.

93. Plaintiff's reliance on Defendant's representations foreseeably caused Plaintiff to suffer significant injuries, damages, and losses.

## VI.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendant, in an amount to be determined by a jury following a trial, and award her all

relief allowed by law and equity, including, but not limited to, the following:[3]

    a. Declaratory relief and injunctive relief, as appropriate;

    b. Actual economic damages, including, but not limited to, front pay and back pay damages, as established at trial;

    c. Compensatory damages, including, but not limited to those for future pecuniary and non-pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses;

    d. Pre-judgment and post-judgment interest at the highest lawful rate;

    e. Attorney's fees and costs; and

    f. Such further relief as justice requires.

**PLAINTIFF HEREBY DEMANDS A JURY TRIAL ON ISSUES SO TRIABLE.**

Respectfully submitted this 11th day of January 2021.

KILLMER LANE & NEWMAN, LLP

*s/ Mari Newman*

Mari Newman
Helen Oh
1543 Champa Street, Ste. 400
Denver, CO 80202
(303) 571-1000
(303) 571-1001 fax
mnewman@kln-law.com
hoh@kln-law.com

*Counsel for Plaintiff*

---

[3] Plaintiff anticipates that she will seek to amend her pleadings to add a claim for exemplary damages pursuant to C.R.S. § 13-21-102, after disclosures have been exchanged and after she has established the existence of a triable issue of exemplary damages.